UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NEW YORK LEGAL ASSISTANCE GROUP, | ) ) ) | **COMPLAINT** |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 26 Civ. 3892 |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, | ) ) ) | |
| Defendant. | ) ) ) | |

## PRELIMINARY STATEMENT

1.      Immigration detention implicates one of the most fundamental liberty interests protected by the United States Constitution: freedom from unlawful confinement.

2.      While removal proceedings are pending, the government has the authority to detain noncitizens on a discretionary or mandatory basis. 8 U.S.C. §§ 1226(a), (c); 1225(b)(1)(B)(ii).

3.      Individuals confined under discretionary detention have the right to a bond hearing before an Immigration Judge ("IJ") and are eligible for parole. 8 U.S.C. § 1226(a)(2).

4.      In the civil immigration system, bond hearings are often the only mechanism by which detained noncitizens may seek release while their removal cases proceed, a process that often takes months or years to resolve. Thus, bond hearings serve as the primary safeguard against arbitrary, prolonged, and unnecessary civil detention.

5.      At a bond hearing, an IJ is tasked with making an individualized custody determination based on evidence of danger and flight risk. This assessment directly determines whether a noncitizen remains in custody or is reunited with their family and community while litigating their removal case.

6.      The importance of bond hearings is heightened by the lack of meaningful judicial review of bond determinations. Under 8 U.S.C. § 1226(e), discretionary custody and bond decisions made by immigration judges are largely insulated from review by federal courts, even when those decisions result in prolonged detention. This jurisdiction-stripping provision places extraordinary power over individual liberty in the hands of executive-branch adjudicators, making transparency, consistency, and adherence to legal standards within immigration courts critically important.

7.      Despite the centrality of bond hearings to upholding liberty interests, the Trump Administration has sought to radically expand which noncitizens can be detained without bond pending their removal proceedings. In a July 8, 2025, memo, Todd Lyons, then-Acting Director of Immigration and Customs Enforcement ("ICE"), issued a memorandum effectively subjecting all noncitizens physically present in the United States and who had not been lawfully admitted to immediate arrest and mandatory detention.[1]

8.      As a direct result of the Trump Administration's decision to effectively shut down bond hearings in immigration court, noncitizens have filed habeas corpus petitions in federal court at record numbers to challenge their unlawful detention.[2]

9.      The New York Legal Assistance Group ("NYLAG") is a nonprofit civil legal services organization that provides free, high-quality representation to low-income New Yorkers, including thousands of immigrants facing detention and removal proceedings each year. Through

---

[1] U.S. Immigr. & Customs Enf't, *Interim Guidance Regarding Detention Authority for Applications for Admission* (July 8, 2025), https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission.
[2] Isabela Dias, *24,403 Lawsuits and Counting: How Habeas Corpus Became the Front Line of Immigration Defense*, Mother Jones (Mar. 3, 2026), https://www.motherjones.com/politics/2026/03/immigration-enforcement-22800-lawsuits-and-counting-habeas-corpus-the-frontline-of-immigration-defense/.

its Immigrant Protection Unit, NYLAG represents detained individuals in bond hearings, removal proceedings, and related habeas litigation, and conducts systemic advocacy aimed at combating unlawful detention practices. For NYLAG, access to information regarding how immigration judges make bond determinations—and how bond hearing orders are implemented or disregarded—is critical to fulfilling its mission, protecting its clients' liberty interests, and engaging in informed advocacy on behalf of New York's immigrant communities.

10.     This action, brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeks to compel Defendant Executive Office for Immigration Review to disclose documents, recordings, and communications relating to whether and how IJs consider, evaluate, or decide bond requests.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

12.     Venue is proper under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C § 1391(e), because the New York Legal Assistance Group has its principal place of business in New York, New York, which is within this District.

## PARTIES

13.     Plaintiff NYLAG is a 501(c)(3) nonprofit organization in New York City that provides free civil legal services to low-income New Yorkers in the areas of immigration, government benefits, consumer debt, disability rights, family law, housing law, and special education, among others. NYLAG is one of the largest immigration services providers in New York City, providing a wide range of legal services specific to immigrants, including representing immigrants in bond hearings.

14.    Defendant Executive Office of Immigration Review ("EOIR") is an agency of the United States government within the meaning of 5 U.S.C. § 552(f)(1).

15.    Defendant EOIR is a sub-agency of the Department of Justice ("DOJ") responsible for adjudicating administrative claims concerning federal immigration laws, including proceedings before the Immigration Courts and BIA. IJs are employees of DOJ and are situated within EOIR. Defendant EOIR has its principal place of business at 5107 Leesburg Pike Falls Church, VA 22041.

16.    Defendant has possession of and control over the records NYLAG seeks under 5 U.S.C. § 552(a)(3).

## STATEMENT OF FACTS

### I.    Systematic Denial of Bond in Immigration Court

17.    For decades, IJs routinely granted bond to immigrants in detention if the noncitizen successfully demonstrated they were not a public safety threat and posed a minimum flight risk.[3] *See* 8 C.F.R. § 1003.19(h)(3); *cf. Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (recognizing that immigration detention may be justified only by "ensuring the appearance of aliens at future immigration proceedings" and/or "[p]reventing danger to the community").

18.    In a departure from this longstanding practice, the Trump Administration has aggressively pushed IJs to automatically deny bond requests from detained immigrants.[4]

---

[3] Miriam Jordan, *Under Trump Policy, Bonds for Immigrants Facing Deportation Are Vanishing*, N.Y. Times (Sep. 24, 2025), https://www.nytimes.com/2025/09/24/us/immigrants-trump-detention.html.

[4] *See, e.g.*, Nicholas Nehamas, Allison McCann, Steven Rich, Jazmine Ulloa, & Hamed Aleaziz, *How Trump Purged Immigration Judges to Speed Up Deportations*, N.Y. Times (Apr. 9, 2026), https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html.

19.    The seismic shift away from granting bond has spawned thousands of habeas corpus cases across the country.[5]

20.    Hundreds of courts, including recently the Second Circuit in *Cunha v. Freden*, 2026 WL 1146044 (2d Cir. Apr. 28, 2026), have rejected the government's position and ordered bond hearings.[6]

21.    Despite explicit court orders to provide bond hearings, the government has managed to manipulate the bond hearing process, rendering them meaningless.

22.    According to former IJs and ICE officials, a greater number of IJs have been systematically denying bond after a pro forma hearing with a predetermined outcome. Those IJs who insist on upholding the due process rights of noncitizens appear to be summarily fired.[7]

23.    According to a report published by Mobile Pathways, 346 immigrants were released on bond in March 2026—a sharp decline from just one year ago, when over 2,400 immigrants were released on bond *each month*.[8]

24.    As of April 4, 2026, ICE has been detaining over 60,000 individuals—a stark increase from the 40,000 at the start of Trump's second term.[9]

---

[5] Sonja Sharp, *Ordered free, still locked up: Judges fume as Trump administration holds ICE detainees*, L.A. TIMES (Apr. 19, 2026), https://www.latimes.com/california/story/2026-04-19/trump-doj-habeas-corpus-immigration-detention.

[6] Kyle Cheney, *Our running list of judges who have ruled on ICE's mass detention policy*, Politico (Apr. 28, 2026), https://www.politico.com/news/2026/02/18/trump-judges-immigration-detention-00784614.

[7] *Rodriguez v. Mason*, No. 26-cv-00122, 2026 WL 510426, at *2 (S.D.W. Va. Feb. 24, 2026).

[8] Jeffrey O'Brien, *The Bond Plummet. Is the Supreme Court Next?*, Mobile Pathways (Mar. 23, 2026), https://www.mobilepathways.org/post/the-bond-hearing-collaps.

[9] TRAC Immigration, ICE Detainees Part A. ICE Detainees by Date and Arresting Authority, https://tracreports.org/immigration/detentionstats/pop_agen_table.html (last visited Apr. 20, 2026).

25.     In line with the report, NYLAG's attorneys have observed IJs declining bond under circumstances that previously would have resulted in a favorable bond determination—release—for the immigrant.

26.     NYLAG itself has filed seventeen emergency habeas cases since May 2025 and has seen firsthand the confusion around bond hearings.

27.     For example, in *Garcia Montalban v. Genalo*, 2026 WL 787846 (S.D.N.Y. Mar. 20, 2026), the government incorrectly placed the burden of proof on the noncitizen during a bond hearing, contrary to a court order requiring that the government bear the burden at a bond hearing.

28.     EOIR has not disclosed any information about the apparent policy change in how IJs are evaluating bond requests. Specifically, EOIR has not shared any information related to how IJs consider, evaluate, or decide bond requests, including but not limited to the interpretation and application of 8 U.S.C. § 1225, 8 U.S.C. § 1226, 8 C.F.R. § 1003.19, and/or 8 C.F.R. § 1236.1.

29.     There is an important need to inform NYLAG, its clients, and other advocates about how IJs adjudicate bond requests.

30.     Because bond requests are the main—and often the only—avenue detained immigrants have to challenge their detention and seek release, the sudden change in bond determinations has an outsized impact on immigrants whose physical safety and ability to remain with families, friends, careers, and communities are put in peril by unlawful detentions.

**II.    NYLAG's Work with Immigrant Populations**

31.     NYLAG serves thousands of low-income clients with ongoing proceedings in New York City Immigration Courts, and is part of coalitions with other legal service providers to leverage joint community resources and organizational expertise to assist low-income, unrepresented, and detained immigrants in removal proceedings

32.     The lack of information about current bond hearing standards impairs NYLAG's ability to represent its clients in bond hearings and provide accurate and comprehensive legal advice to its clients, because NYLAG—and its clients and fellow legal services providers—are deprived of up-to-date information about how IJs make bond determinations.

33.     In addition to NYLAG's obligation to provide information about the applicable standards for bond hearings to its clients, NYLAG routinely shares information received from FOIA requests with community members as it directly pertains to Immigration Court practices and procedures, including relating to bond hearings.

34.     Likewise, NYLAG routinely uses materials obtained through FOIA and other methods to create and publish informational and educational materials for noncitizens and fellow legal service providers. These materials are widely disseminated to the public free of charge.[10]

35.     The public has a compelling interest in understanding whether immigrants' constitutional, statutory, and/or regulatory rights are being infringed upon. This is particularly urgent given the scale of the issue: Over 60,000 people are detained in immigration detention as of April 4, 2026.[11]

### III.    Statutory Background

36.     FOIA requires EOIR to produce requested records. That statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made

---

[10] *See, e.g.*, *NYLAG Obtains FOIA Response About Hearings Procedure Used by SSA Office of Hearings Operations*, Sept. 17, 2024, https://nylag.org/nylag-obtains-foia-response-about-hearings-procedure-used-by-ssa-office-of-hearings-operations/; *NYLAG Obtains FOIA Response About Immigration Judge Complaints in NYC*, Sept. 7, 2023, https://nylag.org/immigration-judge-foia-response/.

[11] TRAC Immigration, *ICE Detainees Part A. ICE Detainees by Date and Arresting* Authority, https://tracreports.org/immigration/detentionstats/pop_agen_table.html (last visited Apr. 20, 2026).

in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

37.    EOIR must respond to FOIA requests within twenty business days. 5 U.S.C. § 552(a)(6)(A)(i).

38.    Agencies may request to extend the standard twenty-business-day time period for responding to FOIA requests by an additional ten business days in "unusual circumstances." 5 U.S.C. § 552(a)(6)(B). Notice of the extension must be sent before the initial twenty-business-day deadline expires. *Id.*

39.    When an agency fails to respond to a requester within the twenty-business-day time limit and does not request extra time in accordance with the statute, the FOIA statute treats the requester as having constructively exhausted its administrative remedies. 5 U.S.C. § 552(a)(6)(C).

## IV.    NYLAG's FOIA Request

40.    On March 2, 2026, NYLAG submitted a FOIA request[12]—one to ICE and another to EOIR—requesting that ICE and EOIR provide the following records:

a) Documents, recordings, and communications operative or created, generated, or promulgated between January 1, 2025, and the present relating to whether and how Immigration Judges consider, evaluate, or decide bond requests, including but not limited to the interpretation and application of 8 U.S.C. § 1225, 8 U.S.C. § 1226, 8 C.F.R. § 1003.19, and/or 8 C.F.R. § 1236.1, including but not limited to formal and informal policies, practice and guidance documents, directives, memoranda, practice pointers, instructions, trainings, slides or PowerPoints, manuals, template language or reference material, meeting notes or summaries, meeting agendas. This

---

[12] *See* Exhibit A.

may include but is not limited to materials governing when bond should be granted and/or denied, the interpretation and/or application of factors, including whether a particular individual or category of individuals is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk.

b) Communications sent to, from, or between Immigration Judges between January 1, 2025, and the present relating to whether and how Immigration Judges consider, evaluate, or decide bond requests, including but not limited to the interpretation and application of 8 U.S.C. § 1225, 8 U.S.C. § 1226, 8 C.F.R. § 1003.19, and/or 8 C.F.R. § 1236.1, including but not limited to all emails, text messages, internal postings or fora, and chat-based messages, including via Microsoft Teams, Signal, Zoom Transcripts, Telegram, WhatsApp, etc. This may include but is not limited to materials governing when bond should be granted and/or denied, the interpretation and/or application of factors, including whether a particular individual or category of individuals is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk.

41. Due to the emergency nature of the request, NYLAG requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). NYLAG routinely represents clients in bond hearings, and each day that it lacks guidance and information harms NYLAG's ability to adequately represent clients. Lack of clarity relating to the process for consideration and determination of bond requests perpetuates unlawful detentions, which can reasonably be expected to deprive detained individuals of physical safety and pose an imminent threat to life.

42. NYLAG requested a waiver of all fees associated with the requests as the requests are in the public interest and serve no commercial interest. *See* 5 U.S.C. § 552(a)(4)(A)(iii). The

9

requested records directly and clearly relate to identifiable government operations and activities leading up to and during bond hearings and NYLAG is a nonprofit organization dedicated to free legal services to low-income New Yorkers. *See* 5 U.S.C. § 552(a)(4)(A)(iii); 6 C.F.R. §§ 5.11(b), (k)(1)(ii), (k)(2)(i), (k)(3).

43.    NYLAG submitted a substantively identical FOIA request to ICE, including a request for expedited processing and fee waivers. On May 11, 2026, ICE emailed NYLAG stating that the requested information was not under the purview of ICE and should be directed to EOIR and closing the request.

44.    EOIR confirmed it received NYLAG's FOIA request on March 2, 2026, by email.

45.    EOIR did not invoke any extension of the standard response deadline; their timeline to request such an extension expired on March 30, 2026. 5 U.S.C. § 552(a)(6)(B). Accordingly, the agency had an obligation to respond to NYLAG's request within twenty business days, that is, by March 30, 2026.

46.    In an email dated April 6, 2026, EOIR denied NYLAG's request for expedited treatment, notwithstanding the fact that the agency had already failed to respond to NYLAG's request within the standard twenty-business-day time limit.

47.    To date, it has been approximately fifty business days since NYLAG submitted its initial FOIA request on March 2, 2026—more than double the twenty days prescribed by statute.

48.    EOIR has not produced any records in response to NYLAG's FOIA request.

**COUNT I**
**FREEDOM OF INFORMATION ACT**

49.    NYLAG submitted a valid FOIA request to EOIR on March 2, 2026.

50.    EOIR has a statutory obligation under 5 U.S.C. § 552(a)(3) and 5 U.S.C. § 552(a)(6)(A)(i) to produce validly requested records within twenty business days.

10

51.     EOIR failed to timely produce any records.

52.     NYLAG is entitled to injunctive and declaratory relief, as well as costs, expenses, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, NYLAG respectfully requests that this Court:

(A)     Declare that Defendant EOIR violated FOIA by unlawfully withholding the requested records;

(B)     Declare that EOIR failure to timely produce the records requested by NYLAG is unlawful;

(C)     Order EOIR to conduct a reasonable search for the requested records and to disclose them to Plaintiff in their entireties and requested format as soon as possible.

(D)     Award NYLAG its costs, expenses, and reasonable attorneys' fees pursuant to U.S.C. § 552(a)(4)(E); and

(E)     Grant such other and further relief as this Court may deem just and proper.

Dated: May 11, 2026
New York, New York

By: */s/ Alexandra Zaretsky*
Alexandra Zaretsky

NEW YORK LEGAL ASSISTANCE GROUP
Alexandra Zaretsky
Kate Fetrow
Shannon Lee (*application for admission approved; admission pending*)
100 Pearl Street
New York, NY 10004
kfetrow@nylag.org
azaretsky@nylag.org
slee@nylag.org
Telephone: (212) 613-5000
Fax: (212) 750-0820

*Attorneys for Plaintiff*